## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| **JOHN CUTCLIFFE** | : | Case No. 3:17-cv-222 |
| | : | Judge |
| Plaintiff, | : | |
| | : | **COMPLAINT WITH JURY DEMAND** |
| -vs- | : | **ENDORSED HEREON** |
| | : | |
| **WRIGHT STATE UNIVERSITY** | : | |
| | : | |
| Defendant. | : | |

Plaintiff, John Cutcliffe, complaining of Defendant, Wright State University, states as follows:

### PARTIES

1.     Plaintiff, John Cutcliffe ("Plaintiff" or "Cutcliffe"), is a resident of the State of Ohio, a Permanent Resident (Green Card Holder), an English male and a citizen of the United Kingdom.

2.     Defendant, Wright State University ("Defendant" or "WSU"), is a public university, organized under the laws of the State of Ohio.

3.     Defendant is an employer within the meaning of state and federal law.

### JURISDICTION AND VENUE

4.     This Court has jurisdiction to hear this case pursuant to 28 U.S.C. 1331 because it arises under the laws of the United States, specifically Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 29 U.S.C. 2000(e) *et seq*.

5.     Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC").  (Exhibit 1)  Plaintiff received a Notice of Right to Sue from the EEOC dated April 4, 2017 and this Complaint is filed within 90 days of receipt of the Notice.  (Exhibit 2)

## FACTUAL ALLEGATIONS

6.     Plaintiff is a 51 year old English male who became employed by WSU on January 1, 2015 as the inaugural holder of the Blanke Endowed Research Chair/Director of Research for the College of Nursing and Health, and a tenured full Professor in the College of Nursing and Health ("CofNH") at WSU.

7.     Prior to his employment at WSU, Cutcliffe had amassed an impressive academic track record, details are captured in his CV.  (Exhibit 3)

8.     Plaintiff was fully qualified for his position at all relevant times.

9.     Plaintiff was a loyal and dedicated employee and performed his duties in a fully satisfactory manner.

10.     Before moving to Dayton, Ohio, Cutcliffe was a resident of Canada with his wife and daughters.

11.     Soon after commencing his positions, Cutcliffe started to become aware of behaviors that were suggestive of nationality-based, gender-based, and discriminatory actions/attitudes toward him.

12.     On the day he interviewed for the positions, which included numerous one-on-one interviews and a presentation to the CofNH faculty, Cutcliffe encountered a number of experiences which raised concerns.

13.     During his presentation to the CofNH faculty, which featured how Cutcliffe was very much an international academic, he heard a number of comments that concerned him.

2

14.     Some faculty stated that they felt intimidated by his English accent; others commented how he had not accumulated much experience in the United States and that his English/foreign experience was not as valuable as USA experience. These statements are corroborated by the affidavit exhibit (Dr. Marie Bashaw affidavit, Exhibit 4.)

15.     During his one-on-one interview with Dean Rosalie Mainous ("Mainous"), Cutcliffe specifically asked questions, such as: What are the major problems facing the CofNH? What degree of collegiality and collaboration between colleagues can be found within the CofNH?

16.     Despite being aware of the history of bullying, incivility, and filed complaints regarding discrimination, Mainous made no reference whatsoever to these behaviors and made no reference to the history of preferential treatment being shown to female American-born nurses.

17.     Mainous made no reference to the then recent, formal investigation into discriminatory practices and bullying within the WSU CofNH, the so-called "Boaz" report. (Exhibit 5)

18.     Mainous claimed that "collegiality" and "collaborative faculty" were actually the strengths of both the CofNH and WSU.

19.     She claimed that, once people had got used to Cutcliffe's "Englishness" and his "accent", they would be very interested in collaborating.

3

20. Mainous also asked several questions about matters such as: Where was Cutcliffe born? What was his wife's nationality and visa/immigration status? What was his age, and even questions about the nationality of his children.

21. During the first year of his employment at WSU, Mainous insisted on regular meetings. The majority of these were held in a one-to-one format.

22. As these meetings continued, Cutcliffe became increasingly concerned and disturbed by some of the statements that Mainous was asserting. She made several remarks that directly or indirectly referred to his "Englishness" and moreover, how for her, this was an impediment for Cutcliffe.

23. For example, during a discussion about chapters to include in a book that Cutcliffe invited Mainous to join him as a co-Editor, Cutcliffe emphasized how the composition of the contributing authors needed to be international. In response, Mainous stated that:

> "England does not produce many high quality nurse scholars. The majority of high quality nurse scholars are from the USA."

Regarding the British experience and healthcare system, she stated:

> "You Brits and your socialized medicine!"

24. In another discussion about Evidence-Based practice, when Cutcliffe disagreed with a substantive statement Mainous made, she responded:

> "What do you know about Evidence-Based practice in England? Do you even have Evidence-Based practice in England? Ohio State University is the center of excellence for Evidence-Based practice in the world". "You are not in Britain now you will have to understand the USA nursing view of Evidence-Based Practice".

25. During another meeting Mainous again referred to Cutcliffe's accent. Mainous claimed that some of the CofNH faculty and one or two of the CofNH administrative assistants

4

had stated that they found Cutcliffe to be pretentious because of his accent, the way that he sounded and the particular vocabulary that he used.

26.    When Cutcliffe asked who had made these claims, she would not tell him.

27.    When Cutcliffe heard these statements, which led him to feel very uncomfortable, he stated that he would be happy to sit down with anyone and listen to their concerns.

28.    Mainous' response was to state:

> "I do wonder if people cannot understand your accent, how
> effective are you going to be when people cannot understand what
> you are saying?"

29.    On another occasion, Mainous told Cutcliffe about the protests that had occurred when he was to be appointed at the rank of full Professor.

30.    Mainous explained that no other new employee member of faculty, other than deans and associate deans, had ever been appointed at the rank of full Professor. and that this had given rise to complaints and allegations from CofNH faculty members that this was only happening because Cutcliffe was a foreigner and that he was taking the position from a USA citizen.

31.    Mainous informed Cutcliffe that the CofNH Promotion and Tenure committee offered their own recommendation that he be hired as an Associate Professor, especially because of his international background and experience and therefore could not be as familiar with the USA and its health care and educational systems and practices.

32. Further, Mainous stated:

"You are going to have to overcome a lot to succeed here. We do not have a strong track record of successful foreign or male nurse employees."

33. During his first few months of employment at WSU, when he was away from his wife and family, Mainous would frequently invite him to lunch, dinner, and even shows (such as "Flashdance").

34. Cutcliffe was uncomfortable with these "after hours" meetings, but was reluctant to decline for fear of repercussions.

35. During these "meetings" Mainous talked at length about her family and their religious beliefs. She told Cutcliffe a story about how she believes in God and miracles because in a house she used to live in, a pet green parrot escaped out of the house. She then took a flashlight and illuminated the parrot at the first attempt. Cutcliffe's response was to state that he was an atheist.

36. Mainous responded:

"You are going to have to keep that to yourself around here. We do not like atheists. I know that you are English and England is not a very religious country."

37. During another such dinner, Mainous referred to Cutcliffe's gender and maleness and how this, in her view, disadvantaged him. For example, Mainous stated:

"Devon Berry (a former male employee in CofNH) tried to tell me what to do – he even wrote a report about what needed to change in the CofNH – and you know what happened to him. We don't have a good track record with the men we hire. I have never met a man who can nurse as well as a woman. My last boyfriend tried to tell me what to do – told me to make him some coffee, I ended the relationship."

38. On another occasion, in the summer of 2015, Mainous stated:

"You are going to have to change your behavior."

6

39.     When Cutcliffe asked about what behavior and on what basis this was being stated, Mainous explained that an undisclosed number of female faculty members had been commenting about Cutcliffe and a fellow male CofNH employee, Chris Brookshire.  (Brookshire Affidavit, Exhibit 6)

40.     In addition to comments made about Cutcliffe specifically, Mainous made derogatory comments about other male employees, specifically disparaging them as males in a female-dominated profession. (Brookshire Affidavit)

41.     Plaintiff was criticized, bullied and treated far worse than similarly situated American-born and female faculty within CofNH.

42.     Both in the years preceding and during Cutcliffe's employment, Mainous engaged in differential/discriminatory treatment towards other males who were not members of her core group of favored friends.

43.     From the time of his initial contact with WSU CofNH, through the time he was removed from the Endowed Research Chair/Director of Research position, Cutcliffe became aware that Mainous has demonstrated discriminatory and differential treatment towards other males.

44.     During this short time, four males had been fired, demoted and/or forced to leave the CofNH.

45.     During the same time frame no female CofNH faculty/administrators were fired, forced to leave or demoted (some did retire).

46.     Cutcliffe learned that immediately prior to Cutcliffe's arrival, Mainous fired Dr. Devon Berry – another high achieving male in the Research Director role.

47.     Upon information and belief, Cutcliffe was aware that Dr. Berry produced a report critical of Mainous' actions and conduct.

48.     In the Autumn of 2015, Mainous fired Mike Morton (male) after he had been falsely accused of drinking while on duty. (Brookshire Affidavit)

49.     In the summer of 2015, Mainous altered the composition and characteristics of the Executive Leadership team that had been comprised of Brookshire (male) and an African-American employee. Mainous subsequently replaced the team with American-born, female women.

50.     Such action was consistent with the conclusions of the Boaz Report.

51.     In his contract of employment with WSU, Cutcliffe was entitled to certain budgeted University funds necessary for him to fulfill his professional and contractual obligations to WSU.

52.     Mainous failed to honor those budget obligations, and Plaintiff was denied access to those funds to which he was contractually entitled.

53.     One such provision was that of an operating budget. During his interview for the position, several specific elements of the position and its operating parameters were discussed.

54.     Having served previously in Endowed Research Chairs and positions that held responsibility for promoting research, Cutcliffe was particularly and specifically mindful to raise the matter of a research budget.

55.     At Cutcliffe's hiring, Mainous stated that the position was supported by an endowment fund and that this fund also provided the funds for a research budget.

56.     Cutcliffe specifically asked about how much funds would be placed in this budget and Mainous unequivocally stated, without hesitation, that the budget would be for "around $40,000 to $50,000 per year and would never be lower than $40,000."

57.     Mainous stated, and this was subsequently confirmed in Cutcliffe's letter of offer/job description (Exhibits 7, 8), that Cutcliffe was solely responsible for this budget and that

8

all decisions as to how the money would/could be spent would be made by the holder of the Endowed Research Chair. (Exhibits 9, 10)

58.     Having served in Endowed Research Chairs and positions that held responsibility for promoting research in several occasions in his past academic career, Cutcliffe would not have considered taking this job without a substantial budget to support research efforts.  Cutcliffe knew from experience that having to promote and increase research activity on a "shoe string budget" was a recipe for failure.

59.     After some months in the role, as he had started to become familiar with the specific research needs of the research active and aspirant research active faculty, Cutcliffe made repeated requests for his budget, and as of six months of employment, it had still not been allocated.

60.     In the autumn of 2015, at a meeting accompanied by Denise Porter (Business Manager for CofNH), Cutcliffe was informed that his budget had been allocated. Mainous/Porter provided him with budget spreadsheets showing that $50,000 dollars had been allocated into his Blanke research accounts. (Exhibit 11)  This budget allocation was consistent with the promise made during the job interview.

61.     The allocation of this $50,000 was confirmed in writing in Mainous' email to Cutcliffe on December 21, 2015 in which she stated:

> "As of that date (July 1, 2015), $50,000 became available to you from the endowment for 2016."

62.     Sometime later, when Cutcliffe tried to access the funds, he was shocked to find that without his knowledge or consent, someone with access to his budget (only two people: Mainous and Porter) had removed $35,000.

9

63.    Cutcliffe raised these and related matters on numerous occasions with Steven Berberich, Associate Provost, Tom Sudkamp, Provost, and University Ombudsman, Hazel Rountree (see emails dated December 11, 2015, December 31, 2015; January 4, 2016, January 6, 2016, and April 13th 2016).  (Exhibit 12)

64.    Cutcliffe specifically asked Berberich to investigate what had happened to the research budget, as he had learned that Mainous had subsequently hired a Graduate Research Assistant to work with her and with other research faculty. The cost of hiring the Graduate Research Assistant was $35,000.

65.    As he looked into this matter, Cutcliffe learned that Mainous had hired the student, a female American-born nurse, without advertising the position locally and externally.

66.    At a later meeting with Berberich, Cutcliffe was provided with a further budget spread sheet which then had a total of $14,000, the exact amount left over from his initial budget of $50,000 minus the cost of hiring the GRA - $35,000.

67.    Cutcliffe reported this discrepancy to the University Administration, but no remedial action was taken and Plaintiff was denied access to the funds.

68.    WSU senior administrators did nothing to investigate, locate, account for or reallocate/return the budget funds in question.

69.    Mainous' hiring a GRA violated the provisions of Cutcliffe's contract/job description, which states that he has responsibility for hiring GRAs.

70.    When Cutcliffe asked Mainous what had happened to the budgeted funds, she refused to provide a satisfactory answer. Rather she stated:

"This wasn't your budget John. It was the CofNH's budget."

71.    On March 31, 2016, Cutcliffe was nominated by a CofNH faculty member for the Faculty Excellence Award: Research/Scholarship. (Exhibit 13)

72.    The criteria for the award, which were approved by the Faculty Award Committee, were then requested and reviewed by Mainous (Exhibit, 14) stated:

> 1.  The annual Faculty Research/Scholarship award recognizes those who are scholarly distinguished in the CofNH.
>
> 2.  Nominees Faculty Research/Scholarship award must have produced (or demonstrated a strong commitment to produce) a significant body of work in scholarship and research.
>
> 3.  The characteristics may include: a.) The nominee demonstrates significant efforts on disseminating findings of research or publishing scholarly works in professional books and journals, b.) The nominees scholarship or research brings distinction to the College and University or national/international recognition to the faculty member, c. Has an ongoing research project or grant that may produce works that significantly impact nursing practice, education or research.

73.    Cutcliffe was eligible for the award did not meet any of the exclusion criteria.

74.    Cutcliffe learned nothing about the outcome of the award until months later, when in response to a public document request, he discovered that Mainous she refused to honor or grant the award.

75.    Mainous had previously communicated this with Berberich, who raised no objection.

76.    In her correspondence to Berberich dated April 23, 2016, (Exhibit 15) Mainous stated, without factual support that:

> "Everyone on the committee gave him full points for a current research project or grant.  There is no current research project, no IRB, no protocol, no awareness of RSP of any research. There are merely some early groups who have met to discuss possible collaborations."

77.    Cutcliffe's nomination met or exceeded at least two of the three characteristics detailed in the criteria; nevertheless, Mainous singled him out and overturned the recommendation for the award.

11

78.     Mainous' actions in denying Cutcliffe this award were consistent with the pattern of discriminatory behavior towards him; the recipients of both the Teaching Excellence award and Service Excellence award were both American-born women.

79.     One of Cutcliffe's duties as the Director of Research was to build research capacity through the formation of identified research groups.

80.     Cutcliffe was approached by Dr. Pratik Parikh ("Parikh"), who asked for a meeting.  At the meeting, Parikh explained how he was interested in "interruptions research," for which he was seeking partners/research collaborators from the CofNH.

81.     The research team was formed and started to hold regular meetings, identified a number of possible studies, identified at least three funding sources where they could apply for a research grant and settled on a study of interruptions of a common nursing skill- aseptic technique.

82.     Between November 2015 and April 2016 the team continued to plan the study, agree upon a research design, decide on a funding source to target, identify additional possible future studies and future grant opportunities.

83.     Shortly thereafter, Cutcliffe received a phone call at home from Parikh.

84.     Parikh informed Cutcliffe that he had a meeting with his Dean, that his Dean informed him that Mainous was already working on interruptions research and that he was withdrawing from their collaboration to focus on research with Mainous.

85.     Cutcliffe stated that he was disappointed with his decision but respected it.

86.     Cutcliffe later discovered that Mainous had secretly engaged in spreading malicious, slanderous and completely fabricated statements about him. (Exhibit 16)

87.     Documents establish that the following occurred:

12

a.) Mainous visited/communicated with the Dean of Engineering and Parikh concerning the interruptions research and about Cutcliffe's alleged conduct.

b.) Mainous fabricated information about Cutcliffe and made serious allegations as to his conduct and personal failings, upon which the Dean of Engineering, who had never even met Cutcliffe, instructed Parikh to withdraw from the study.

c.) In an email dated April 22, 2016. Parikh stated, "I pointed to him [his Dean] the recent issues surrounding John, which I didn't realize he was already aware of."

d.) Mainous, having set all of this in motion, then wrote to the Associate Provost claiming that the demise of the research group was an example of Cutcliffe burning bridges. She stated "Dr. Parikh came to meet with me about how to extricate himself from a project with John. Evidently, engineering had an idea, met with John over time, and now the project doesn't even have engineering in it and John made himself the PI So today, Pratik called John to tell him he was going a different direction. John spent 20 minutes trying to get the guy to say I put him up to it and according to Pratik, he held firm. Then John asked him to put the entire conversation in writing and Pratik refused. Then John told him he was going to proceed with the project. That's all I know and I did not solicit this entire series of events. One other example of John burning bridges."

88.    At a Leadership meeting Mainous publicly threatened Cutcliffe.

89.    During that meeting the topic of faculty and student attendance at an upcoming MNRS conference was discussed, and Mainous alluded to how she wanted Cutcliffe to provide financial support for both faculty and students.

90.    In response, Cutcliffe explained that:

a.) there were no such funds available to support faculty;

b.) the Blanke Endowment agreement document stipulates what the funds could be spent on legitimate and routine annual support for faculty to attend a conference is not included;

c. ) that he would however, consider any and all requests for financial support from the budgets that he was responsible for and consider such requests in the context of prudent, fiscal

13

> management of the budget and supporting requests that would give
> the "biggest bang for the buck". In other words, he would support
> the requests that would stand the best chance of advancing the
> research mission of the CofNH.

91.     Mainous responded with a threat to Cutcliffe stating:

> "You do know you work at my pleasure!"

92.     Cutcliffe was astonished that someone in Mainous' position would resort to threatening him in a public meeting.

93.     Cutcliffe was embarrassed by her public treatment toward him and is aware of no other faculty being publicly embarrassed or threatened by Mainous.

94.     Cutcliffe responded: "Did you just threaten me?" upon which Mainous averted her eye contact and refused to answer the question.

95.     Due to the persistent unaddressed culture of bullying and incivility in the CofNH, the WSU senior administration and AAUP reached an agreement that all nursing committee meetings would have to take place with a member of the senior administration and a member of the Union, in attendance.

96.     No such supervision of committee meetings was required or occurred within other Colleges within WSU; a further indication of just how severe the problem of bullying, discrimination and incivility had become.

97.     All Faculty members subsequently received an email with attachments from Berberich, which included committee allocation for 2015-2016. (Exhibit 17)

98.     In addition to his College committee activities, Cutcliffe also had the Leadership team meetings (two or three meetings per month), service on the University Research Council (meeting once a month), and Institutional Review Board meetings (once per month).

99.     Not only did Cutcliffe have the greatest number of College level committees toserve on, but when these were added to his other committee duties, he had the most committee participation, more than any other CofNH faculty member.

100.     In June 2015 Cutcliffe received a call from Jodi Blacklidge ("Blacklidge"), asking if he would serve on the so-called Expedited Review Advisory Committee - IRB.

101.     While he was interested in serving, he had to decline given that he already had the highest number of committees to serve on.  (Exhibit 18)

102.     Blacklidge then wrote to Mainous, who, without consulting Cutcliffe or even informing him, stated that she would add his name to the committee membership.

103.     Blacklidge informed Mainous that Cutcliffe had previously been contacted and had declined.

104.     Cutcliffe then received an email from Mainous where she failed to mention that she had already "volunteered" his name without any discussion or his consent, stating that she would "Like to submit my name..." and "...if there is any reason why you're unable to serve, please let me know as soon as possible."

105.     Cutcliffe responded the same day, explaining that he already had the highest committee allocation in the College, and that this committee would serve as an ideal learning opportunity for a less experienced scholar.

106.     In response, Mainous tried to list the reasons why other faculty (female American-born), could not possibly participate in this committee.

107.     Cutcliffe replied and recapped his committee allocation as requested. His message also pointed out that he had consulted with the Chair of the IRB and he concurred with Cutcliffe's assessment that this committee would be better filled with a more junior nursing scholar.

108.    Cutcliffe's responses and the rationale of the IRB were ignored and Mainous ordered him to serve on the committee.

109.    Thus, Cutcliffe was again unfavorably treated, in contrast to female, American colleagues. Cutcliffe was assigned to the committee without any consultation or consent, over the recommendation of the IRB chair.

110.    Since commencing his position at WSU CofNH, Cutcliffe was a regular invitee/member of the Leadership Meeting.

111.    Cutcliffe regularly attended these meetings.

112.    On occasion, as the minutes/notes of these meetings reflect, other members of the Leadership Meeting did not attend. On such occasions, apologies were offered and the meetings proceeded.

113.    When this occurred, nobody was reprimanded, singled out or punished in any way for not attending the meeting.

114.    On July 13, 2015 Mainous sent an email regarding non-attendance at the meetings, stating:

> "Due to travel, vacations, and holidays it has been difficult to get everyone together and holding first and third Friday mornings for the big group has not worked well."

115.    In January of 2016, Cutcliffe informed Mainous that he could not attend a Leadership Meeting since his workload prevented him from fulfilling/exercising his CBA-protected right to outside employment.

116.    Mainous' response was to report him to Berberich, claiming falsely that this was the second week in a row that Cutcliffe had not attended. No other member of the Leadership team or Executive Team had received such an email and no other faculty were similarly reported to Berberich.

117.    During his first semester at WSU CofNH, Cutcliffe was assigned to teach a Research and Evidence-Based practice course.

118.    According to the student evaluations of the course, Cutcliffe performed to a very high standard. The mean averages for each teaching category were 4.19 – 4.94, when the highest rating is 5. The written feedback statements were overwhelmingly positive. (Exhibit 19)

119.    Regrettably, one student's performance did not meet the required academic standard and Cutcliffe had to award a failing grade.

120.    The student appealed her grade, as was her right.

121.    The first Cutcliffe knew about such an appeal, despite being the member of faculty solely responsible for the course, was when the Appeals Committee administrative assistant circulated an email on June 9, 2015 indicating the need for a vote.  (Exhibit 20)

122.    The Chair of the Appeals Committee had failed to provide Cutcliffe with any notification that an appeal had been lodged.

123.    Faculty members began replying to the call for an email vote, with copies sent to all recipients.

124.    Neither the Chair nor any member of the committee contacted Cutcliffe and asked him for the relevant information.

125.    That procedure was a violation of the WSU Graduate School Appeals policy.

126.    After over 25 years of experience in academia and having worked at several universities, Cutcliffe was shocked that a student appeal process would not require relevant academic/student performance information or his response to the appeal.  Accordingly, he contacted the Graduate School to see if this was policy at WSU and/or the CofNH.

127. Cutcliffe was informed by the Graduate School that the appeals process required a response from the course instructor of record. The Graduate Office informed him that it could not proceed without input from him.

128. On receiving this information, Cutcliffe sent a "Reply to all" email on June 10, 2015. The four page email provided detailed information that refuted the student's claims. Postings from the course web pages, written feedback on assignments and how to improve, feedback on draft assignments, and copies of the grades posted, were included.

129. Upon receiving the relevant information from the instructor, the majority of the faculty altered their votes and supported Cutcliffe's decision to fail the student, as did the Graduate School. Other Faculty did not change their vote.

130. However, without Cutcliffe's knowledge, one member of the faculty took it upon herself to write to another faculty member and attempted to sway the vote against Cutcliffe, stating:

> "Marie [Bashaw], if you can do talk to the student and Anne, you'll have a very different view. I have always supported the Director because I trust and value their opinion. I know you like him and it's a free country and you're absolutely entitled to your vote. But he is rude and there is more than meets the eye. Just one person's opinion. I continue to support the student." (Bashaw Affidavit; Exhibit 21)

131. The email to influence the vote against was not sufficient for the faculty member, who then took it upon herself to visit another faculty member in person, where she proceeded, forcefully, to attempt to coerce the faculty member into changing her vote.

132. The faculty member was very uncomfortable with this unethical behavior. She described it as being bullied. The faculty member felt compelled to report the incident to the WSU Administration.

133.    Cutcliffe has worked at seven different universities and academic institutions for nearly 30 years. As a result, Cutcliffe is acutely aware that from time-to-time, disputes and disagreements will arise.

134.    It has been Cutcliffe's experience that such disputes and/or disagreements are best resolved through informal dialogue, in a face-to-face meeting. Email tends to lead to misunderstandings and misinterpretations.

135.    He has also found that disputes are resolved when individuals behave professionally.

136.    The Article 16 Grievance and Arbitration article in the CBA states:

> "16.1 The parties recognize and endorse the importance of establishing a prompt, fair and efficient mechanism for the orderly resolution of complaints and agree to make every effort to encourage the informal resolution of complaints before they become formal grievances. Any formal or informal resolution achieved must be consistent with the terms of this Agreement. **The procedures set forth in this Article shall be the sole and exclusive method of disposing of grievances.**" (Emphasis added)

137.    Cutcliffe faced a disagreement with a faculty member who did not want to share her teaching materials. (Exhibit 22)

138.    Rather than agree to Cutcliffe's offer and request to sit down and talk the dispute through to resolution, the faculty member and Mainous started writing emails seeking to have Cutcliffe subjected to a formal grievance.

139.    Cutcliffe was not made aware of such communication at the time.

140.    Article 16 of the CBA requires that faculty make <u>every effort</u> to resolve disputes informally; no such efforts were made in this case.

19

141. In violation of Article 16.4.1 of the CBA, the request for a reprimand did not use the required grievance form, nor did it identify the contractual provisions allegedly violated, or the dates of the alleged act in violation of Article 16.

142. While Cutcliffe attempted to abide by the provisions of the CBA, other faculty within the CofNH were offered informal grievance resolution.

143. On other occasions, Cutcliffe was singled out and targeted by faculty for a) using the salutation "Guys" on an email; and b) writing a review for one member of administration that resulted in a different member of faculty attacking CUTCLIFFE for writing this.

144. On July 15, 2016 Cutcliffe filed a Charge of Discrimination with the EEOC, of which WSU was made aware shortly thereafter.

145. There were multiple other substantive examples of differential treatment from Mainous directed at Cutcliffe.

146. For example, in an Executive team meeting, Cutliffe's workload and teaching allocation were discussed. (Exhibit 23)

147. In addition to discussions, according to the action items distributed, Cutcliffe was singled out for alterations to his teaching allocation/workload, stating:

> "Course releases will NOT be granted in the future to Dr. Cutcliffe."

148. The Executive Team has no authority over or responsibility for assigning courses or determining workload.

149. No other member of Faculty within the CofNH has been singled out this way.   No other faculty member has been subject to a decision that they will never be granted a course release in the future.

150.     Mainous singled out Cutcliffe on multiple occasions for inappropriate, unethical and unprofessional communications. Her email dated November 5, 2015, sent to another member of Faculty of the CofNH contains unfounded criticism about Cutcliffe and engage in a dialogue with this member of faculty about Cutcliffe behind his back.

151.     The email message inappropriately states that the Faculty will "feel out" how another member of faculty feels about Cutcliffe. This junior member of faculty had no authority or responsibility over Cutcliffe.

152.     Another email from Mainous to Berberich in October 2015 (Exhibit 24), contains a series of false, evidence-less accusations about Cutcliffe.

153.     In that email, Mainous attempted to clinically diagnose Cutcliffe with a mental health problem; she referred to his "extreme paranoia".

154.     Mainous has no mental health qualification, training, certification, licensure or expertise.

155.     In another email apparently related to the Graduate Student appeal discussed above Mainous, without notifying Cutcliffe, responded to another member of faculty in the CofNH who failed to follow the Graduate School policies and CBA Articles regarding student appeals and dispute resolution.

156.     Rather than bring this to the attention of Cutcliffe as she was required to do, Mainous assures the other faculty member that this will be worked on by her "behind the scenes."

157.     In other emails dated 26th October 2015 and October 9th 2015, Mainous wrote to Berberich and no copies were sent to Cutcliffe.

158.     In these messages, two Faculty members had sent emails to Mainous containing false, undocumented, spurious and libelous statements regarding Cutcliffe.

159.    Rather than instruct the Faculty to make every effort to deal with the dispute informally, as she was required to do according to the CBA, and rather than bringing the parties together to discuss and resolve the dispute, Mainous acted only on the information she received from the faculty.

160.    Mainous made no effort to investigate this matter, made no effort to obtain or consider Cutcliffe's position and made no effort to manage or resolve the situation herself. Rather she singled Cutcliffe out again for secreet and misleading communication with Berberich.

161.    In response to his experiences in the CofNh at WSU, Cutcliffe has made a number of complaints, asked for certain issues to be investigated, brought these matters to the attention of Senior Administrators in WSU. (Exhibit 25) Berberich discouraged Cutcliffe from pursuing his complaints outside of WSU.

162.    In every case, these complaints were ignored.

163.    In cases where there has been a dispute or disagreement, Cutcliffe followed Article 16 of the CBA and tried to seek informal resolution.

164.    As early as December 2015, Cutcliffe repeatedly complained to university administration, including the President, Provost, Assistant Provost and University Ombudsman about the discriminatory treatment, bullying and harassment he was experiencing.

165.    On March 23, Cutcliffe was told by Associate Provost Steven Berberich that Mainous intended to make changes to his administrative appointments.

166.    On March 28, 2016, Mainous notified him that he was being removed from the position of Director of the Center of Nursing Research and the Endowed Chair for Nursing Research effective July 1, 2016. (Exhibit 26)

167.    Such action by Mainous and WSU was a severe blow to Cutcliffe's professional reputation, causing him psychological and physical harm, and loss of earnings.

22

168.   The letter gave no reasons for such a drastic decision.

169.   On April 5, 7 and 13, 2016, Cutcliffe requested an explanation for the decision to remove him from his administrative appointments.

170.   Cutcliffe was assured that an explanation would be forthcoming from Mainous explaining her decision to remove him from his Endowed Research Chair and Director of Research positions. No such explanation was ever provided from her.

171.   Rather than receiving an explanation from Mainous, Cutcliffe received a letter from Manzler, WSU Assistant General Counsel and Assistant Attorney General dated April 18, 2016, (Exhibit 27) offering an explanation for the removal of his Blanke Endowed Chair and Director of Research positions. However, the letter did not contain any references to evidence to support the allegations and claims.

172.   Manzler did not produce any explanation, documents or evidence to support the allegations or claims contained in his letter.

173.   Any alleged complaints from faculty members should have been submitted in writing and retained.

174.   The letter merely contained unattributed and uncorroborated assertions concerning Cutcliffe's performance and behavior.

175.   In response, Cutcliffe submitted a detailed refutation of the alleged reasons.

176.   Manzler stated "The overarching reason for your removal from the endowed Chair and Director role was your lack of effectiveness in the position."

177.   Cutcliffe's performance in the position was very good, as evidenced by his Faculty Activity Report (FAR) (Exhibit 28), and a powerpoint presentation that he was asked to produce and deliver at a faculty meeting. (Exhibit 29)

178.     Mainous was aware of his performance outcomes and achievements as these were communicated to her in writing in his FAR and the presentation given to all nursing faculty. They were also communicated verbally through reports given at Leadership team meetings and individual meetings.

179.     Formal performance expectations and goals for Cutcliffe's 2015 annual performance were discussed, negotiated, agreed upon with Mainous and documented. (Exhibit 30)

180.     These were the only annual goals for Cutcliffe for 2015 and he met or exceeded 22 of the 23 annual goals agreed upon.

181.     In his first year of employment at CofNH, Cutcliffe delivered the most productive and meritorious academic performance that a single member of faculty in the CofNH has ever had in a single year.

182.     His academic performance was so strong that Berberich acknowledged how Cutcliffe had become the most cited academic in the entire University (this achievement was noted and celebrated in the University magazine and on the CofNH and University website).

183.     Berberich characterized his teaching evaluation scores as Excellent.

184.     Cutcliffe led and participated in 12 newly formed inter-professional and international research teams.

185.     Despite the increasingly challenging fiscal situation that WSU faced, Cutcliffe increased the research dollars captured from 2014 ($242,555) to 2015 ($597,565), with a further $972,554 requested in additional research grant submissions.

186.     Cutcliffe increased the number of internal and external grant submissions from 2014 – (one submission) to 2015 – six (6 submissions) including an international research grant submission.

187. In terms of capacity building, in 2015, three tenure track faculty under Cutcliffe's guidance submitted research grant applications for the first time.

188. For example, Cutcliffe was engaged to assist individual CofNH faculty members:

a.) Dr. Marie Bashaw: engaged with him in writing/submitting three external research grants, co-writing peer reviewed publications, engaged in two research studies – one now completed.

b.) Dr. Sheryl Smith: Sought him out for feedback and direction regarding her National League of Nursing research grant submission, which after including his recommended amendments, was funded. Also sought his advice about how to respond to correspondence regarding her HRSA grant -- which was also subsequently funded.

c.) Dr. William Mattcham: Worked together, along with colleagues from the College of Engineering, and submitted a research grant regarding the use of technology in falls prevention/harm reduction and a collaborative effort with colleagues from the College of Engineering.

d.) Dr. Rosemarie Eustace: co-authored and submitted a federal level, Center for Disease Control grant with Dr. Eustace, Dr. Wilson and other colleagues from the School of Medicine. Notably, given Mainous' allegations of alienation, it should be noted that Dr. Eustace requested Cutcliffe to serve in the role of research mentor on this grant. Dr. Eustace was also a co-investigator on Cutcliffe's ualitative Meta-Synthesis of Hope Inspiration project.

e.) Dr. Misty Richmond: She was invited to join him as a co-author on a peer reviewed publication which notably would have been her first such paper at WSU. The paper was accepted for publication. Such was Dr. Richmond's appreciation of Cutcliffe's inviting and supporting her in this writing team, that she stated in an email:

"John, I also wanted to thank you personally for including me in this article and for being patient with me in my overwhelmed state. I appreciate it very much."

f.) Mr.Tyler Green: He asked Cutcliffe if he would be willing to serve as his Doctor of Nursing Practice thesis supervisor. Cutcliffe

invited Green to join him as a co- author on a peer reviewed publication which notably would have been his first such paper at WSU. The paper was accepted for publication.

g.) Dr. Ann Russell: She worked on a research team involving colleagues from the College of Engineering and Cutcliffe, focusing on "managing and reducing the negative impacts of interruptions in clinical nursing."

h.) Dr. Ann Bowling: She approached Cutcliffe on a number of occasions and asked him to read, critique and comment on three of her attempts at writing for peer reviewed journal. She also sought his direction and guidance on at least two research grant submissions, which he provided.

i.) Dr. Ann Stalter: She approached him on at least three separate occasions and asked him to read, critique and comment on various attempts at external research grant capture.

j.) Dr. Barbara Fowler: She approached him on at least four separate occasions and asked him to read, critique and comment on various attempts at external research grant capture.

k.) Dr. Sherrie Farra: She approached him several times asking him to co-author and co-write papers.

l.) Dr. Cindra Holland: She coordinated with Dr. Pat Martin, who was coordinating with Cutcliffe in advising and guiding Dr. Holland's peer reviewed writing attempts.

m.) Dr. Tara Konicki: She was invited to be a co-investigator on Cutcliffe's Qualitative Meta-Synthesis of Hope Inspiration project, and she accepted.

n.) Dr. Detrice Barry: She met with Cutcliffe on several occasions and expressed a willingness to look at research options in the summer of 2016.

189. Conversely, regarding certain faculty who had expressed hostility toward

Cutcliffe:

a.) Dr. Brewer was reached out to by Dr. Cutcliffe on at least two occasions; on both occasions, there was either no response at all or a refusal to meet.

26

b.) Dr. Skordo on at least two occasions stated to Cutcliffe that she had no interest in research.

c.) Dr. Gray stated on at least two occasions to Dr. Cutcliffe that she had no interest in research.

190. Manzler stated that Cutcliffe did not hire a GRA as Mainous had instructed him to do.

191. According to the letter of offer/contract Cutcliffe received for the Blanke Endowed Research Chair/Director of Research for the CofNH, and the job description/position information, his duties and responsibilities included, "Oversight for research staff and operations which may include graduate assistants."

192. According to documents pertaining to his duties and job description, the holder of the Blanke Endowed Research Chair/Director of Research was responsible for Graduate Research Assistants (GRAs). (Exhibit 31)

193. An instruction from Mainous to hire a GRA would have been a violation of the terms of his contract.

194. Cutcliffe never received a command or order from Mainous to hire any GRA.

195. In a number of one-on-one meetings with Mainous and in various email correspondence, Cutcliffe did point out that there were insufficient funds available in the budget to hire a GRA. At the time of this request, Cutcliffe maintained approximately only $7,000 - $8000 in the budget. Hiring a GRA, including the payment of their course fees, would have cost over $15,000.

196. Manzler accused Cutcliffe of working for an outside agency without approval, stating:

"Instead, what resulted from these contacts with Grandview was that you obtained a contract for your own private consulting business. This, at a minimum, is an apparent conflict of interests,

27

and may be a violation of Ohio ethics law, a matter which we are continuing to investigate."

197.    Cutcliffe never had any such contract. The only outside employment that he engaged in had been approved by Mainous, which was working with a facility in Northern Canada.  (Exhibit 32)

198.    The American Association of University Professors-WSU Collective Bargaining Agreement states (Exhibit 33) that members have the right to engage in outside employment, and that subject to complying with the conditions in Article 22, then there is no conflict of interest.

199.    Mainous', and subsequently Manzler's accusation were false, since Mainous asked the Chief Nursing Officer of Grandview Hospital for an update on the work and copy of the alleged contract. The CNO of Grandview informed Mainous there never was any work contracted or commissioned. (Exhibit 34)

200.    Mainous and Manzler advanced a baseless, false accusation regarding Cutcliffe's outside employment, then proceeded to threaten him with legal/ethical actions/investigations. Multiple faculty members within the CofNH routinely engage in outside employment and receive awards and praise for such work.

201.    Cutcliffe was threatened with ethical investigations and legal actions for engaging in an outside employment situation that never existed.

202.    Manzler stated that Cutcliffe did not develop local research connections as instructed.

203.    Cutcliffe established research connections with:

    a.) Grandview Hospital: Cutcliffe had numerous exploratory meetings with Peggy Mann (and others) from Grandview Hospital, starting in the spring of 2015.  Together with Ms. Mann, he looked at a variety of possible research connections including: use of seclusion rooms, trauma informed care, setting up a Professorial unit and group work. (Exhibit 35)

28

b.)  Wright Patterson Air Force Base: Cutcliffe initiated an initial contact meeting and subsequently met with Colonel Dukes, Melissa Wilson and Dan Kirkpatrick back in the summer of 2015. This was followed up with a second meeting, various phone calls, culminating in my organizing a research project sharing' half day event at WSU. Not only did Cutcliffe forge such connections with WPAFB researchers, but he continues to work with them. (Exhibit 50)  Dr. Melissa Wilson a Nurse Scientist at WPAFB, stated that Manzler's assertion is false, misleading and clearly not at all in accordance with her experience.  (Exhibit 36)

c.)  Premier Health: In addition to the so-called Premier/Versant' residency study, which Cutcliffe was actively involved with for (at least) the first four months of his employment, he arranged meetings with Dr. Pat O'Malley, and also reached out proactively to Dr. Syl Trapanier (Exhibit 37).

d.)  Kindred Health: Cutcliffe had a productive initial meeting with Beth Hock at Kindred and had a further meeting arranged. (Exhibit 38)

e.)  Kettering Hospital: Cutcliffe organized and met with Dr. Cheryl Walker, had numerous meetings with Dr. Brenda Kuhn and others to explore options regarding joint projects. Persons there also said how pleasantly surprised they were that he had reached out to them and initiated a meeting, considering that nobody from the CofNH had engaged them previously, as far as they could remember.

f.)  Dayton Veterans Administration Hospital: Cutcliffe arranged an initial introductory meeting with Ms. Anna Monet. This was followed by a meeting with a larger team and he had begun looking at areas and projects where we might collaborate.  (Exhibit 39)

204.    Manzler stated that Cutcliffe "advertised" his consulting company via the "E" signature on WSU emails.

205.    As was customary, Cutcliffe's email "E" signature listed all his affiliations, including several University positions, his qualifications, and his role with Cutcliffe Consulting. This was not an advertisement nor an effort to solicit business.

206.    He first became aware of any potential issue with his "E" signature when the CofNH Business Manager decided to tell him it had to be removed.

29

207.    Cutcliffe requested clarification, as he had seen other CofNH faculty emails that contained similar "E" signature material, so he specifically wrote to Berberich about this matter and asked whether or not it was prohibited to include his complete contact details on an "E" signature.

208.    Berberich responded that he would get back to Cutcliffe, which never occurred.

209.    Cutcliffe also requested a copy of the relevant University policy which was never provided.

210.    He first consulted a clinical psychologist in February 2016 to discuss initiating therapy and commenced sessions with her in April 2016 to address the symptoms that he was experiencing as a consequence of the unfair treatment at WSU.

211.    He continued to see his Doctor on a regular basis; most commonly visiting weekly/bi-weekly.

212.    On September 22, 2016 Cutcliffe emailed Berberich with a request to take sick leave or short term medical leave.

213.    Cutcliffe was subsequently contacted by the Disability Leave Co-ordinator (Henne); he completed all the necessary paperwork and checked with Henne to confirm receipt that all his paperwork was in order.

214.    After all the documentation was received, neither Henne nor anyone else at WSU indicated that there was any problem with Cutcliffe's request or the submitted paperwork, even when he asked specifically about the paperwork.

215.    Henne indicated the number of sick days and vacation days Cutcliffe had amassed. She also stated how Cutcliffe could use these days.

216.    Henne stated:

30

> "As of 8-29-16 you have 169 hours/21.125 days of sick leave, and
> 157.4 hours/19.675 days of vacation leave accrued and available to
> use. You are required to use all of your sick leave before you can
> draw any short term disability (STD) benefits."

217.    Cutcliffe responded and in response to the information provided by Henne, laid

out the leave days he required as follows:

> "(from a balance of 21.25 days sick time)
> Week September 19th - 23rd - 40 hours (5 days) Sick Time
> Week September 26th - 30th - 40 hours (5 days) sick time
> Week October 3rd - 7th - 40 hours (5 days) sick time
> Week October 10th - 14th - 40 hours ( 5 days) sick time
>
> (from a balance of 172 hours)
> Week October 17th - 21st - 40 hours (5 days) vacation time
> Week October 24th - 28th - 40 hours (5 days) vacation time
> Week October 31st - November 4th - 40 hours (5 days) vacation
> time."

218.    Ms. Henne provided no indication that the days suggested were improper or in

error in any way.

219.    On October 11, 2016, Cutcliffe received an email plus attachment from Henne

stating that he was instructed to attend a "second opinion" regarding approval/denial of his

FMLA leave request.

220.    The demand that Cutcliffe attend an evaluation for a second opinion was

unsupported by any explanation why WSU had a "reason to doubt the validity" of his

psychologist, Meredith Glick Brinegar, PhD. In fact, there was no "reason to doubt the validity"

of her certification.  WSU never contacted the psychologist for "clarification and authentication

of the medical certification. (29 CFR 825.307)

221.    Requests for FMLA leave submitted by other WSU employees and faculty had

been approved without requiring attendance at a second opinion consultation.

222.    A letter from Cutcliffe's attorney to Manzler pointed out the demand to attend the second consultation was discriminatory.  Further contradictory and false information was then communicated to Cutcliffe as follows:

223.    On October 13, 2016, two days after being informed by WSU that no decision had been reached regarding his leave, Cutcliffe received an email from Henne indicating that his leave had been approved.

224.    On October 19, 2016 Cutcliffe received another email from Henne, this time indicating that his leave had NOT been approved.

225.    On October 26, 2016, Cutcliffe received an email from Henne indicating that the sick leave/vacation days data he supplied were inaccurate.

226.    Cutcliffe asked on what basis Henne was making this claim and asked for copies of all the sick leave/vacation leave forms he had submitted.

227.    Henne and WSU have both refused to provide those forms.

228.    On  December 7, 2016 Cutcliffe received another email from Henne, indicating that his leave had NOT been approved.

229.    The message also stated that Cutcliffe's vacation days had been applied to the beginning of his leave (September 19, 2016 until it was exhausted on October 17, 2016).  This was contrary to the express request for leave submitted by Cutcliffe.

230.    Two days later, December 9, 2016, Cutcliffe received yet another email from Henne, with an attached approval form, indicating that WSU had approved his leave request.

231.    That same day, December 9, 2016, Cutcliffe received another email with attachment from Ms. Henne, this time stating that his leave was not approved, and as a result, WSU was demanding that Cutcliffe repay $12,536.25.

232. On 10th December 2016 Cutcliffe received a letter at his home address, in which it stated that his sick leave request had been denied. This letter was physically attached to a copy of the leave request form which showed that Cutcliffe's had been approved. This letter was cc'd to Berberich.

233. On December 21, 2016, Cutcliffe received an email from Berberich where he stated:

> "We do not understand why, in your email below, you would reference "WSU's non-approval of the time/dates requested in my previous FMLA forms."

234. On December 22, 2016, Cutcliffe received another email from Berberich, this time containing yet another version of events regarding WSU's approval/non-approval of his leave request. It stated:

> "Accordingly, the University denied your request to utilize paid sick leave, but granted you the benefit of the doubt and approved your unpaid FMLA leave despite your lack of cooperation."

235. On March 13, 2017, Cutcliffe received another letter from WSU, this time stating that he was currently on FMLA-covered leave.

236. WSU threatened disciplinary action against Cutcliffe for refusing to attend the second psychological evaluation. In response to his unlawful removal from the Endowed Chair and Director positions, and the unlawful requirement that he attend a WSU-ordered psychological consultation, Cutcliffe resigned ( and therefore, constructively discharged) from employment at WSU effective May 2017.

237. After Cutcliffe was no longer an employee, Berberich mailed another letter which Cutcliffe received on May 24, 2017. This was a copy of the letter stating that Cutcliffe's request for leave had not been approved and that as a result Cutcliffe owed $12,536.25.

238. In response Cutcliffe emailed Berberich and stated:

33

"For the attention of Dr. Berberich, I received this morning a
further harassing letter, I believe this is now the third, referring to
alleged overpayment from WSU to me.  In the letter, your state that
my sick leave requested was denied and thus this has resulted in an
over-payment.  I response, you are referred to an email sent to me
from Ms. Henne (dated 2016-12-09) and to the accompanying pdf
copy of the sick leave request form; both of which categorically
refer to the approval of my sick leave request.  Further your
attorney, Mr. Manzler has completed numerous legal responses
(EEOC for example) where he also refers to the approved sick
leave request."

239. The repeated conflicting correspondence informed Cutcliffe that his leave request

had been approved, had not been approved, and a request he did not submit was approved.

240. This pattern of behavior, of sending contradicting and mutually exclusive

communications to Cutcliffe regarding the approval/non-approval of leave, of causing gross

confusion and stress, coupled with threatening letters regarding false claims of over-payment,

was part of the continuing pattern of retaliation to Cutcliffe's filing with the EEOC and other

opposition to unlawful employment practices at WSU.

## **FIRST CLAIM FOR RELIEF**

### **(Title VII – Sex Discrimination)**

241. Plaintiff realleges the foregoing paragraphs as if fully rewritten herein.

242. The unlawful actions of WSU against Cutcliffe, because of his sex as described

herein, violate Title VII, as amended, 29 U.S.C. 2000(e) *et seq*.

243. WSU's actions were intentional, willful, wanton, malicious, and in conscious

disregard for Plaintiff's rights.

244. As a direct and proximate result of Defendant's unlawful discriminatory conduct,

Plaintiff has been injured and is entitled to damages.

34

## SECOND CLAIM FOR RELIEF

### (Title VII – National Origin Discrimination)

245.     Plaintiff realleges the foregoing paragraphs as if fully rewritten herein.

246.     The unlawful actions of WSU against Cutcliffe, because of his national origin as described herein, violate Title VII, as amended, 29 U.S.C. 2000(e) *et seq*.

247.     WSU's actions were intentional, willful, wanton, malicious, and in conscious disregard for Plaintiff's rights.

248.     As a direct and proximate result of Defendant's unlawful discriminatory conduct, Plaintiff has been injured and is entitled to damages.

## THIRD CLAIM FOR RELIEF

### (Retaliation)

249.     Plaintiff realleges the foregoing paragraphs as if fully rewritten herein.

250.     Plaintiff engaged in protected activity by opposing the unlawful, discriminatory practices described herein.

251.     The unlawful actions of WSU against Cutcliffe because he opposed unlawful employment practices, violate Title VII, as amended, 29 U.S.C. 2000(e) *et seq*.

252.     WSU's actions were intentional, willful, wanton, malicious, and in conscious disregard for Plaintiff's rights.

253.     As a direct and proximate result of Defendant's unlawful discriminatory conduct, Plaintiff has been injured and is entitled to damages.

## FOURTH CLAIM FOR RELIEF

### (Constructive Discharge)

254.     Plaintiff realleges the foregoing paragraphs as if fully rewritten herein.

255.     As a consequence of WSU's discriminatory treatment toward Cutcliffe, having

unlawfully removed him from his Endowed Chair and Director positions, and having threatened further retaliation, caused him to involuntarily resign from employment..

**WHEREFORE**, Plaintiff demands judgment against Defendant as follows:

(a)   That Defendant be enjoined from further unlawful conduct as described in the Complaint;

(b)   That Plaintiff be reinstated to his employment;

(c)   That Plaintiff be awarded all lost pay and benefits;

(d)   That Plaintiff be awarded compensatory damages including emotional distress;

(e)   That Plaintiff be awarded liquidated damages;

(f)   That Plaintiff be awarded punitive damages;

(g)   That Plaintiff be compensated for adverse tax consequences of receiving a lump sum rather than compensation over several separate tax years;

(h)   That Plaintiff be awarded reasonable attorneys' fees and costs; and

(i)   That Plaintiff be awarded all other legal and equitable relief to which he may be entitled.

Respectfully submitted,

/s/ *Jeffrey M. Silverstein*
Jeffrey M. Silverstein (0016948)
George M. Reul, Jr. (0069992)
Trial Attorneys for Plaintiff
FREKING MYERS & REUL LLC
One Elizabeth Place, Suite 220
Dayton, OH 45417
Ph: 937/228-3731/Fx: 513/651-2570
*jsilverstein@fmr.law*
*greul@fmr.law*

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable.

/s/ *Jeffrey M. Silverstein*