John Cutcliffe,

*Plaintiff, Counter-Defendant,*

v.                                    **Case No. 3:17-cv-222**
                                      **Judge Thomas M. Rose**

Wright State University,

*Defendant, Counter-Claimant.*

---

**ENTRY AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, ECF 31, GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, ECF 32, AND DENYING MOTION TO STRIKE RESPONSE IN OPPOSITION, ECF 42. SUMMARY JUDGMENT IS AWARDED TO DEFENDANT ON PLAINTIFF'S CLAIMS AND ON DEFENDANT'S COUNTERCLAIM. WRIGHT STATE UNIVERSITY IS ORDERED TO SUBMIT A PROPOSED JUDGMENT ENTRY THAT WOULD EFFECTUATE THIS ORDER AND TERMINATE THE CASE BY FEBRUARY 1, 2019.**

---

Pending before the Court are Defendant's Motion for Summary Judgment, ECF 31, Defendant's Motion for Summary Judgment on Defendants' Counterclaim, ECF 32, and Defendant's Motion to Strike ECF 38, Response in Opposition to Motion. ECF 42. Because there is no genuine issue of material fact, summary judgment can be awarded to Defendant on Plaintiff's employment discrimination and retaliation claims against Defendant and on Defendant's counterclaim for unjust enrichment. Defendant's Motion to Strike, ECF 42, will be denied.

**I.      Background**

Plaintiff John Cutcliffe is a 52-year-old male, British citizen, born and raised in England. On November 14, 2014, Defendant Wright State University simultaneously hired Cutcliffe into multiple capacities that included: Director of the Center for Nursing Research in its College of Nursing Health; "Bertram C. and Lovetta R. Blanke Endowed Chair for Nursing Research" that accompanied the Director position, and full Professor with tenure in the College of Nursing Health. When Cutcliffe was invited to Wright State to interview with the College of Nursing Health Dean and faculty as a candidate for these positions, he specifically asked Dean Rosalie Mainous about the collegial environment in the College of Nursing Health. He was told that collegiality was one of the strengths of the college. (Cutcliffe depo. pp. 209-210).

Mainous did not mention that a recent report prepared by Wright State's Office of Equity and Inclusion concluded that there was rampant incivility and bullying within the college, specifically directed at three racial minorities: an African-American professor, a Chinese-American professor and a Jewish-American professor. (Bashaw depo. pp. 32-37, Brookshire depo. p.30, Boaz depo. Ex. 33).

Plaintiff has not been replaced. (Bashaw Dep. 26). As Director, Plaintiff was at-will, serving at the pleasure of the Dean. (Mainous Dep. 47-48; Cutcliffe Dep. 370). As faculty, Plaintiff was a union member. (Cutcliffe Dep. 85; Ex. D).

Plaintiff's role as Director included leading the research in the College of Nursing Health. (Mainous Dep. 45). Plaintiff described his Director duties as "capacity building, mentorship, nurturing, building research teams." (Cutcliffe Dep. 107; Ex. I). As Director, Plaintiff reported directly to Mainous. Mainous served as the College of Nursing Health's Dean from August 2011 until January 2017. (Mainous Dep. 15-16, 272). Mainous reported to the Wright State Provost,

but the bulk of her communications regarding Plaintiff were with the Associate Provost, Steven Berberich. (Mainous Dec., ¶¶2-3)

During his interviews with Mainous and during dinners with Mainous in his first months of employment,[1] Cutcliffe heard what he considers male bashing and xenophobic comments from Mainous. (Cutcliffe depo. p. 212). During his interview process, prior to being hired, Mainous inquired about his children's and wife's nationality (Cutcliffe depo. p. 213); and stated that Englishness would be an impediment to his success. (Cutcliffe depo. p. 213-214);

During his first few months of employment at Wright State, Mainous would frequently invite Cutcliffe to lunches and dinners. During these encounters, Mainous talked at length about her family and their religious beliefs. Cutcliffe once stated that he was an atheist. Mainous responded: "You are going to have to keep that to yourself around here. We do not like atheists. I know that you are English and England is not a very religious country." (Cutcliffe depo. pp. 180, 200). During another dinner, Mainous referred to Cutcliffe's gender and maleness and how this, in her view, disadvantaged him. She also described former professor Devon Berry as a "psychopath" who participated in a male-dominated and misogynistic church. (Cutcliffe depo. p. 196) Mainous stated, "Devon Berry tried to tell me what to do – he even wrote a report about what needed to change in the [College of Nursing Health] – and you know what happened to him. We don't have a good track record with the men we hire." (Cutcliffe depo. p. 178) Mainous had

---

1 Plaintiff alleges that the comments reflecting national origin and gender animus he describes during his hiring and first months of employment continued "throughout his employment." Allegations supported only in very general terms, not recounting when or how often the incidents occurred, nor who made the disparaging remarks do not constitute direct evidence that a suspect animus motivated an employment action. *Dotson v. Norfolk S. R.R. Co.*, 52 F. App'x 655, 659 (6th Cir. 2002); see also *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293–94 (11th Cir. 2012).

also "never met a man who can nurse as well as a woman." (Cutcliffe depo. p. 226)   She also said, "My last boyfriend tried to tell me what to do – told me to make him some coffee, I ended the relationship." (Cutcliffe depo. p. 449)

On another occasion, in the summer of 2015, Mainous stated, "You are going to have to change your behavior."   When Cutcliffe asked about what behavior and on what basis this was being stated, Mainous explained that an undisclosed number of female faculty members had been commenting about Cutcliffe and a fellow male College of Nursing Health employee, Chris Brookshire. (Brookshire Affidavit, Exhibit 6)   She also said England did not have many high-quality nursing scholars, (Cutcliffe depo. p. 184), which Cutcliffe admits to be true. (Cutcliffe depo. p. 178, 179).   She questioned whether England even had any evidence-based nursing (Cutcliffe depo. p. 179); stated England does not have many high-quality scholars and stated that Cutcliffe's English/foreign nursing experience was not as valuable as USA experience. (Cutcliffe depo. p. 205).   In addition to comments made about Cutcliffe specifically, Mainous made derogatory comments about other male employees, specifically disparaging them as males in a female-dominated profession. (Brookshire Affidavit).

Other staff told Cutcliffe that as an Englishman, staff and faculty considered him arrogant and pretentious. (Cutcliffe depo. p. 181);

Mainous is a white, female, American, Professor of Nursing who became Dean at Wright State College of Nursing Health in 2011.   Even before her conversations with Cutcliffe, Wright State investigations and reviews characterized her as "capricious and discriminatory." (Ribak Decl. Apxs.1, 2; Berberich depo. p. 29, Ex 33; Mainous depo. p. 257 and Ex. 13).   As she later did with Cutcliffe's annual performance objectives, Mainous ignored Professor Judy Ribak's documented

accomplishments and "found fault in several new ways." She refused to recommend her for tenure, that decision being overruled by the University Promotion and tenure committee. (Ribak Decl., Apx. 2). When Cutcliffe was removed from the Endowed Chair/Director position, Wright State asserted that Cutcliffe was "ineffective" in his role as Director. Yet, Mainous conceded that he "met the vast majority of the goals that he was expected to meet." (Mainous depo. p. 181). Cutcliffe achieved 21 of 23 of his stated performance goals, mostly in his first year, as reflected in his 'Faculty Activity Report' Report and his "performance aims. (Cutcliffe depo. p. 323, Ex. CC, Doc.12-2 Ex. 30).

At one point Cutcliffe complained to Mainous that he was being targeted by a female faculty member who engaged in discriminatory actions. Mainous confided in Associate Provost Steven Berberich that these actions of the College of Nursing Health toward Cutcliffe "would be overwhelming in terms of intimidation," but her response to Cutcliffe's complaints was to state, "I will not support disciplining this faculty member [a female, American professor] without following through with disciplinary actions on the others waiting in the queue."

Mainous reduced the allocated research funding for purposes unrelated to Cutcliffe's research mission. Cutcliffe complained to Berberich that Mainous had unilaterally expropriated the funds allocated to his research. Cutcliffe later discovered that Mainous had indeed removed the funds, acknowledged to Berberich that she had done so, and eliminated 85% of his promised allocated budget. When he questioned the reduction of his budget, Mainous said to Cutcliffe, "You know you serve at the Dean's pleasure." (Cutcliffe depo. p. 328; Brookshire depo. p.69).

Cutcliffe's responsibilities included "oversight for research staff and operations which may include graduate assistants," and management of an annual budget. (Cutcliffe Depo. Ex. D). His

authority to hire and manage graduate research assistants was abrogated. (Cutcliffe Decl. Exs. 8, 9, 11, 13; Brookshire depo. p.69). Cutcliffe was nominated for a faculty award that was subject to Mainous' review. (Cutcliffe depo. p. 314-316 Ex. 26). Ignoring the vote of the Committee, Mainous refused to support the Committee's recommendation. (Berberich depo. p.71 Ex. 41). By contrast, the two American female nominees recommended for other awards were supported by Mainous. (Bashaw depo. p. 169, Cutcliffe depo. p. 314-316).

On November 5, 2015, Mainous e-mailed Professor Cindra Holland asking, "Is Tara [Konicki] afraid of Dr. Cutcliffe? Are all the faculty up there afraid of Dr. Cutcliffe?" (Mainous depo. p. 82). She suggested that Cutcliffe had a mental illness, claiming he had moved "into the realm of extreme paranoia" (Mainous depo. p. 252). On another occasion, Mainous noted of Cutcliffe: "[m]y weekly meetings of my Leadership Team. Second week in a row hadn't shown up. Is the below a violation of the CBA?" (Mainous depo. pp. 321-323 Ex. 15).

Plaintiff complains that Mainous received an email from a professor in the Wright State School of Engineering who wanted out of a research project with Cutcliffe. Wright State policy calls for the Professor to deal directly with Cutcliffe. Mainous discussed the research project with the professor, after which he responded, but never discussed the situation with Cutcliffe (Mainous depo. p. 171).

On November 10, 2015, Cutcliffe raised concerns about discrimination, hostility, incivility and bullying directed at him with Senior Wright State Administrators Berberich and Bill Rickert. Cutcliffe (along with Brookshire) brought his concerns to the University Ombudsman, who then made Berberich aware of the complaints. (Cutcliffe Decl. Ex.14, 15; Berberich depo. pp. 15, 20). Internal communication between the senior administrators acknowledged the hostile work

environment. (Cutcliffe depo. p. 333, Ex. EE; Doc 12-1, Ex. 12)(Rickert email). Berberich informed Rickert that he would not act on Cutcliffe's faculty-to-faculty related complaints. Rickert admitted that, "I do, however, see an environment wherein it would be really hard to do what he's been hired to do." (Cutcliffe Decl.Ex.15).

On March 28, 2016, Cutcliffe was notified that he was being removed from his administrative positions. (Cutcliffe Depo. Ex. PP). While Plaintiff expected to continue in this role until June 30, 2016 (Mainous Dep. 52-53; Ex. PP), he informed Berberich that he was finished performing Director duties. (Mainous Dep. 53; Cutcliffe Dep. 390-91, "I'd already instructed -- excuse me, informed Dr. Berberich, when he removed that position, that then I wasn't going to do it from that movement forward."). After he requested clarification as to the reasons for the administrative action from the Provost, Cutcliffe received a detailed letter from Michael Manzler, Associate General Counsel and Assistant Attorney General, explaining the reasons for the removal (Cutcliffe Depo. Ex. BBB). Cutcliffe responded with a detailed rebuttal. (Cutcliffe Decl. Ex. 12).

On April 5, 2016, Plaintiff emailed Wright State's upper management, threatening them with legal action and demanding an explanation. (Ex. QQ). Mainous decided to end Cutcliffe's role as Director because, in her judgment, Plaintiff was "ineffective in the position." (Mainous Dep. 49, 71; Ex. BBB). She provided examples reflecting Plaintiff's ineffectiveness. Id. At Plaintiff's request, Wright State's legal counsel provided Plaintiff with an overview of the primary reasons for his removal on April 18, 2016. (Ex. BBB).

On July 8, 2016, Plaintiff filed a charge of discrimination and retaliation with the EEOC regarding the loss of his Director title. (Ex. TT). On April 4, 2017, the EEOC issued a Right to Sue Letter, finding no probable cause. (Ex. UU).

Defendant has a counterclaim for reimbursement of unearned pay.

The terms of his employment as the "Blanke Endowed Chair" are governed by an offer letter dated October 24, 2014 (Cutcliffe Depo. Ex. D), as well as the Wright State-AAUP TET Faculty Agreement, the collective bargaining agreement governing full-time tenured faculty. (TET CBA). Articles 28 and 30 govern a faculty member's leave and benefits. The TET Agreement provides in pertinent part:

> 28.6 Sick Leave Authorization and Use. Sick leave may be used during any period of time in which the Bargaining Unit Faculty Member is under contract to perform services for the University. During the summer a Bargaining Unit Faculty Member is required to use sick leave only during the terms when he or she is accruing sick leave pursuant to Section 28.4. Bargaining Unit Faculty Members shall report all uses of sick leave and shall supply to Human Resources any reasonable documentation which may be required by the University, including verification from a physician(s). The University has the right to require a second opinion to confirm a diagnosis and the need for sick leave. If the University requires a second opinion, it will be at the expense of the University.

PageID 2164.

Cutcliffe advised Berberich by email on September 22, 2016 that his health status had deteriorated and that he needed "to take sick leave/short term disability." (Cutcliffe Decl. Ex.1). Berberich responded to Cutcliffe's "Sick Leave Short Term Disability Notice" on that same date, copying Dean Mainous and Jamie Henne, by acknowledging Cutcliffe's request for short term disability leave and noting that Henne was instructed to "inform [Berberich] once [Cutcliffe's] request has been documented." (Id.). The following day, Berberich again responded to Cutcliffe's "Sick Leave Short Term Disability Notice" email stating in part:

> Please be informed that based on your September 22, 11:35 am email to me, the Dean and your lawyer, the [College of Nursing

Health] anticipates you will be utilizing sick leave and not attending your class on Monday evening. Furthermore, I remind you that BUFMs are required to notify their Department Chair (in [College of Nursing Health] this is the Dean) as early as possible (sic) their anticipated date or return from sick leave (CBA 28.7.5).

(Cutcliffe Decl. Ex. 2). Henne's email of that same date provided Cutcliffe with FMLA and STD forms. (Cutcliffe Decl. Ex. 3,). Four days later, in response to a request from Cutcliffe for verification of the paid sick leave hours he had earned, Henne emailed him and indicated the hours of sick leave and vacation time that he had accrued as of August 29, 2016. (Cutcliffe Decl. Ex.4). In the same September 27, 2016 email, Henne advised Cutcliffe; in response to this request for sick leave and short-term disability leave as follows:

You need to complete the FMLA request form and the Unum Employee Statement. Your physician needs to complete the Unum Physician's Statement. Most physician's (sic) charge to complete forms so typically we will accept the Unum physician's form in place of the FMLA's physician's form.

(Id.). When Cutcliffe followed up with Henne on October 4, 2016, she confirmed receipt of the FMLA and Unum STD forms.

On October 5, 2016, Cutcliffe sent an email to Henne setting forth the dates of leave he was seeking and indicating that he was requesting to use all of his earned sick leave prior to using a portion of his earned vacation time for the leave of absence he was requested to run from September 19 through November 4, 2016. Henne's advised Cutcliffe that if he could not complete his University leave report online, he could ask his Business Manager, Denise Porter, to assist him with completion. (Cutcliffe Decl. Ex. 5.)

On October 11, 2016, the University sent Cutcliffe a letter stating that he was being sent for medical evaluation for a second opinion, "[i]n order to make a decision to certify or deny your

leave under the FMLA…to determine whether or not you have a serious health condition that renders you unable to perform your job." (Doc. 26-1, Cutcliffe Depo. Ex. JJJ).  As the letter indicates, the University's demand that Cutcliffe submit to a second opinion examination, was for purposes of FMLA certification. Cutcliffe decl. Ex. 6).

On October 13, 2016, Henne again contacted Cutcliffe regarding the status of his FMLA leave request and whether he intended to return to work.  Despite Cutcliffe's October 5, 2016 email in which he clearly set forth the days for which he requested leave from September 19 through November 4, and the designation of his leave as paid sick leave followed by vacation time, Henne claimed that she was unaware of whether he intended to return to work on the following day, October 14, 2016. (Id.).  She instructed him to complete additional FMLA forms. (Id.). Cutcliffe responded to this email on that same day by advising Henne that he had submitted a form indicating his sick days and vacation time and that on the advice of his doctor he will remain on leave as indicated in his prior emails, and he inquired about any additional forms necessary to apply for STD leave after his FMLA leave with sick days and vacation time is exhausted. (Cutcliffe Decl. Ex. 5)

Henne did not respond to Cutcliffe's October 13, 2016 email until 4:54 p.m. on October 19, 2016, less than 16 hours before the evaluation scheduled by the University.  She asserts that Cutcliffe has not properly requested leave beyond October 13, 2016, and explains that the University is sending him for a second opinion "as it is expressly permitted to do under both the FMLA and the TET Faculty collective bargaining agreement." (Id.).  At 5:06 that same evening, the University's General Counsel sent an email to the undersigned arguing that the University was entitled to require a second opinion under the FMLA and under the TET Agreement for any

bargaining unit faculty member requesting sick leave. (Cutcliffe Decl. Ex. 6, 7).   In the email, the University's General Counsel threatened Cutcliffe with "serious consequences" including denial of his FMLA leave and sick leave requests "if he does not cooperate with our instruction that he undergo examination by another doctor (Dr. Frederick Sacks) tomorrow morning so that we may obtain a second opinion regarding his ability or inability to perform some or all of his job duties." (Id.).

On October 19, 2016, Wright State's counsel sent Plaintiff's counsel an email highlighting CBA Section 28.6 and Wright State's right to send Plaintiff to an exam. (Doc. 38.1, Ex. 6; PageID #2192).   Wright State's counsel also explicitly warned him that in the event Plaintiff did not cooperate with the instruction, "there will be serious consequences for him under both the FMLA and CBA, including potential denial of his leave request…" Id.   Plaintiff testified that he did not attend the appointment because "I wasn't going to subject myself to any, what I considered to be, further differential treatment." (Cutcliffe Dep. 465).

Plaintiff exhausted his accrued paid vacation time on October 18, 2016 (Cutcliffe Dep. 469-70; Ex. MMM). Wright State paid Cutcliffe's salary from that date through November 30, 2016.   Plaintiff was also inadvertently allowed to remain on Wright State's group insurance benefit plans through January 31, 2017, even though he refused to remit the premium contributions.

Henne sent Plaintiff a letter informing him that he had been inadvertently overpaid by Wright State for the time of October 18 – November 30, 2016 in the gross amount of $17,460.24. (Ex. OOO).   Henne also notified Plaintiff that he owed Wright State the full premium for certain employment benefits, including medical insurance, dental insurance, vision insurance, group life

insurance, short term disability, long term disability, and dependent care flexible spending, in the monthly amount of $575.42. Plaintiff's benefits premium for November 2016 was due by December 15, 2016, and his benefits premium for December 2016 was due by January 15, 2017, for a total of $1,150.84 (as detailed in the letter). Id. Wright State sent notices to Plaintiff of the overpayment (Exs. NNN; OOO; SSS; TTT; VVV), but Plaintiff did not intend to return the $22,845.24 at issue. (Cutcliffe Dep. 475).

Plaintiff owed the following amounts for benefits paid by the University: $575.42 for November 2016 $575.42 for December 2016 $2,117.08 for January 2017 $2,117.08 for February 2017. Henne advised that all past due premiums (in the total amount of $5,385.00) were due by March 27, 2018. Id. His stated reason for keeping the money was, "I think the reason for turning down my sick time was fraudulent as an example of retaliation." Id.

In his Complaint, Plaintiff alleges separate counts of sex discrimination and national origin discrimination against Wright State both in violation of Title VII, as amended, 29 U.S.C. § 2000(e) et seq.; and one count of retaliation against Wright State. Plaintiff also brings what he describes as a "constructive discharge" claim.

Wright State filed a counterclaim against Plaintiff alleging Wright State inadvertently overpaid Plaintiff $17,460.24 in wages for the period of October 18, 2016-November 30, 2016. Wright State claims it is entitled to an additional payment of $5,385.00 for medical insurance, dental insurance, vision insurance, group life insurance, short-term disability, long-term disability and dependent care flexible spending provided to Plaintiff for the months of November 2016, December 2016, January 2017, and February 2017.

## II.    Standard

The standard of review applicable to motions for summary judgment is established by Federal Rule of Civil Procedure 56 and associated case law. Rule 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. at 56(c). Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). Thus, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions and affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Id.*, at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S., at 250 (quoting Fed. R. Civ. at 56(e)).

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go

beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S., at 324.

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. *Anderson*, 477 U.S., at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affiants are more credible. 10A Wright & Miller, *Federal Practice and Procedure*, § 2726. Rather, credibility determinations must be left to the fact-finder. *Id.*

Finally, in ruling on a motion for summary judgment, "[a] district court is not…obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). Thus, in determining whether a genuine issue of material fact exists on a particular issue, the court is entitled to rely upon the Rule 56 evidence specifically called to its attention by the parties.

III.    Analysis

A.    Discrimination

Title VII of the Civil Rights Act of 1964 prohibits employment discrimination "based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16(a). It is a violation of Title VII to take an adverse employment decision against an employee because of his or her membership in a protected class. See, e.g., *White v. Columbus Metro. Hous. Auth.,* 429 F.3d 232, 240 (6th Cir. 2005).

Plaintiff John Cutcliffe asserts Defendant Wright State University discriminated against him because of his gender and national origin. In spite of Plaintiff having pleaded separate claims

14

of gender and national origin discrimination, "Title VII does not permit plaintiffs to fall between two stools when their claim rests on multiple protected grounds." *Shazor v. Prof'l Transit Mgmt., Ltd.*, 744 F.3d 948, 958 (6th Cir. 2014); *Coffman v. U. S. Steel Corp.*, 185 F. Supp. 3d 977, 982-83 (E.D. Mich. 2016) ("Plaintiff's discrimination claim is 'intersectional' because it is based on the combination of her race and gender, rather than on her race and/or gender separately."); *Thompson v. City of Columbus*, 2014 WL 1814069, at *4 (S. D. Ohio May 7, 2014) ("Sex-plus" discrimination, defined as discrimination based on sex plus some other characteristic, is "widely recognized.").

A plaintiff may establish a claim of discrimination either by presenting direct evidence of discrimination or by presenting circumstantial evidence that would support an inference of discrimination. *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997). Direct evidence is where an employer's statement directly shows discriminatory motive. See *Schlett v. Avco Fin. Servs., Inc.*, 950 F. Supp. 823, 828 (N.D. Ohio 1996). Evidence that would require the jury to infer a fact is not direct evidence. *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1081 (6th Cir. 1994). Direct evidence, in the form of verbal comments, will be similar to an employer telling its employee, "I fired you because you are disabled." *Smith v. Chrysler Corp.,* 155 F.3d 799, 805 (6th Cir. 1998); see also *In re Rodriguez*, 487 F.3d 1001, 1008-09 (6th Cir. 2007) (plaintiff had direct evidence of discrimination where a decision-maker stated that the plaintiff would not receive a promotion because of his Hispanic speech pattern and accent). The discriminatory statement must bear some kind of connection to the adverse action. See, C*esaro v. Lakeville Cmty. Sch. Dis*t., 953 F.2d 252, 254 (6th Cir. 1992).

An isolated comment by a member of the employer's hiring committee that they "wanted a grass roots *guy*" does not constitute direct evidence of discrimination "because the critical inquiry [in a sex discrimination case] is whether gender was a factor in the employment decision at the moment it was made." *White v. Columbus Metropolitan Housing Auth.*, 429 F.3d 232, 239 (6th Cir. 2005) (citations and internal quotations omitted, emphasis added). Similarly, generalized comments by an employer's managers about reducing their workforce's average age does "not constitute direct evidence of age-based bias against th[o]se particular plaintiffs." *Rowan v. Lockheed Martin Energy Systems, Inc*., 360 F.3d 544, 548 (6th Cir. 2004).

Here, while Plaintiff twice uses the phrase "direct evidence," PageID 2077, 2084, he does not argue that he has direct evidence sufficient to withstand summary judgment, relying instead on the *McDonnell Douglas*, 411 U.S. 792, 802-04 (1973), burden-shifting paradigm.

Under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973), when a claim is based on circumstantial evidence, a plaintiff must first establish a *prima facie* case of discrimination, the elements of which vary slightly depending on the theory asserted. The Sixth Circuit applies a modified *McDonnell Douglas* framework when a majority plaintiff is involved. See, e.g., *Zambetti v. Cuyahoga Cmty. Coll*., 314 F.3d 249, 255 (6th Cir. 2002). Plaintiff must establish the first prong of a *prima facie* case by showing "background circumstances [to] support the suspicion that the defendant is that unusual employer who discriminates against the majority." Id. (internal quotations omitted). The other prongs remain familiar: (2) that the plaintiff was qualified for the job; and (3) suffered an adverse employment action. *Arendale v. City of Memphis*, 519 F.3d 587, 603 (6th Cir.2008). Under prong (4), Plaintiff must show that he was treated

differently than similarly situated employees of a different race. *Romans v. Michigan Dep't of Human Servs.,* 668 F.3d 826, 837 (6th Cir. 2012)

Additionally, under the "same-actor inference," when a plaintiff is terminated by the same person who hired him with knowledge of his membership in a protected class, it is unlikely that discrimination was the reason for the discharge. *Buhrmaster v. Overnite Transp. Co.*, 61 F.3d 461, 464 (6th Cir. 1995). "This principle is grounded in the idea that there is inherent dissonance in a decision maker hiring someone and then shortly thereafter firing that person on the basis of the person's age, race, or some other protected classification." *Mora v. Walgreen Co.*, 2013 U.S. Dist. LEXIS 40427, *12 (S.D. Ohio Feb. 8, 2013). Mainous knew that Plaintiff was a male and English when she hired him. She was the same person that made the decision to remove him from the directorate 15 months later. This time span is sufficiently short. See, *Brooks v. Cincom Sys.*, 2013 U.S. Dist. LEXIS 188132, *24 (S.D. Ohio June 10, 2013) (21 months deemed sufficiently short).

Wright State "agrees that, to its knowledge, Plaintiff possessed the minimum qualifications for the Director position and [the] Professor [position]; [Wright State]…does not concede, however, that he met its legitimate performance expectations." PageID 2027 n.11. Thus, Wright State concedes that Plaintiff meets the second element when hired, but not when he lost these positions. Wright State also contests the third element of the *prima facie* case with respect to the loss of his Director position. Wright State argues that Plaintiff's "constructive discharge" was a voluntary resignation.

If the plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant to offer evidence of a legitimate, nondiscriminatory reason for its adverse action. If the

defendant satisfies its burden, the burden shifts back to the plaintiff to identify evidence from which a reasonable jury could find that the stated reason is a pretext for discrimination.

Plaintiff cannot show that he was treated differently than other similarly situated individuals of different races or genders. Mainous made numerous changes in her faculty's administrative appointments – more so than other deans did. (Cutcliffe Dep. 374-75; Bashaw Dep. 144). Mainous removed Plaintiff from his Director role; Donna Curry from her position as Associate Dean for Graduate Programs; Bobbe Gray from the Doctor of Nursing Practice Program; and Barbara Fowler from her Director of Research role (prior to Plaintiff's arrival). (Mainous Dep. 276-81; Bashaw Dep. 144). These are true comparators – tenured College of Nursing Health faculty members who were placed in at-will administrative positions to serve at the pleasure of the Dean in addition to their teaching duties.

Even if Plaintiff could establish a *prima facia* case of discrimination, Wright State proposed a legitimate reason for terminating Plaintiff's directorship. Plaintiff has offered minimal evidence why the reason put forth by Mainous for the removal of him as Director was a pretext for discrimination/retaliation. He cannot show that the reason for his removal: 1) had no basis in fact; 2) was not the actual reason; or, 3) was insufficient to explain the decision. *Manzer v. Diamond Shamrock Chems. Co*., 29 F.3d 1078, 1084 (6th Cir. 1994).

A court "may not reject an employer's explanation [of its action] unless there is sufficient basis in the evidence for doing so." *Gray v. Toshiba Am. Consumer Prods*., 263 F.3d 595, 600 (6th Cir. 2001). However, not every evidentiary conflict regarding an employer's non-discriminatory reason entitles a plaintiff to a trial. Rather, the circumstances of the conflicting evidence must suggest in some way that the employer acted for discriminatory reasons. *Braithwaite v. Timken*

*Co.*, 258 F.3d 488 (6th Cir. 2001). Plaintiff is required to show "more than a dispute over the facts upon which the discharge was based." Id. at 494. Plaintiff must show that Wright State did not "honestly believe" in the stated reason. *Majewski v. Automatic Data Processing, Inc*., 274 F.3d 1106, 1117 (6th Cir. 2001) ("As long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect.").

A defendant employer can demonstrate that its belief in its purportedly legitimate and non-discriminatory reason is "supported by particularized facts after a reasonably thorough investigation." *Davis v. City of Clarksville*, 2012 U.S. App. LEXIS 14481, *24-25 (6th Cir. July 13, 2012); *Wright v. Murray Guard, Inc*., 455 F.3d 702, 709 (6th Cir. 2006).

Wright State responded to Plaintiff's inquiries for his loss of his Director position with a letter explaining their legitimate non-discriminatory reasons for his demotion. Wright State asserts, Mainous relieved Plaintiff as Director because of the reports of alienation she received from College of Nursing Health faculty and staff, as well as witnessing his behavior herself in meetings and in a staff retreat. (Mainous Dep. 72). Plaintiff concedes that there was "growing discontent" with him from Wright State employees beginning in late 2015, including Berberich, Mainous, and at least four other faculty members. (Cutcliffe Dep. 60-63). Mainous pointed out that by Plaintiff's own admission, multiple colleagues were unhappy with his performance. (Mainous Dep. 73-74). Mainous indicated that it was well over 50% of faculty and staff; there were "many, many reports." Id. at 74-75. Mainous counseled Plaintiff numerous times about his behavior. Id. at 78.

Further, Mainous witnessed Plaintiff's presentation on July 28, 2015 at a College of Nursing Health staff retreat on assertiveness. (Cutcliffe Dep. 243). Plaintiff was "rude, condescending, tried to embarrass people, he cut them off." (Mainous Dep. 78). The evaluation comments were not favorable: Plaintiff left the staff "angry and bewildered;" "a polarizing figure like Dr. Cutcliffe was not an ideal choice for 'assertiveness training;'" "the presentation by Dr. Cutcliffe gave great examples of bullying – by the presenter to the participants;" and so on. (Ex. L).

At least two faculty members who gave "brown bag lunch presentations" at events coordinated by Plaintiff reported to Mainous that they would never do that again because Plaintiff demeaned them in front of the group. (Mainous Dep. 80-81). At least one junior faculty member was afraid of Plaintiff. Id. at 84-86. On another occasion, Plaintiff stood up as Mainous was seated and screamed at her until his face turned purple. Id. at 87. Another faculty member informed Mainous that Plaintiff had provided her with his CV, told her to read it, and said he would quiz her on it the next day. Id. at 88. Plaintiff incorrectly told faculty that the College of Nursing Health did not have a statistician to support their research. Id. at 89-91. Faculty accused Plaintiff of creating a hostile work environment. Id. at 123-24. Interpersonal communication was a "big issue." Id. at 284. Mainous dissuaded others from documenting these instances because it was disrupting the business of College of Nursing Health. Id. "There were so many complaints and problems, I would spend all day documenting on [Plaintiff] just to keep up with it." Id.

Many members of the College of Nursing Health faculty and staff did not want to work with Plaintiff, Id. at 177, whose primary function was to work with faculty members to further their research and scholarly activity.

Additionally, Mainous granted course releases (a reduction in their teaching load) to two faculty members who were working under the leadership of Plaintiff. (Mainous Dec., ¶6). In mid-October 2015, Mainous asked these faculty members how the project was progressing. They indicated that Plaintiff had not yet called a meeting although the semester had begun in August. (Mainous Dep. 92-94). When Mainous approached Plaintiff to discuss the matter, he screamed at her for checking on the status because she "had no business asking … how they're doing on the project." Id. at 96. Plaintiff tried to order Mainous to stop questioning the faculty. Id. at 97. The first meeting was not held until late November and both faculty members verified this. Id. Accordingly, Mainous directed that no future course releases would be granted for Plaintiff. Id. at 362; Cutcliffe Dep. 62-63; Ex. 24.

Wright State's letter further explained that Mainous asked Plaintiff to hire a Graduate Research Assistant to support the grant-writing efforts of College of Nursing Health faculty. (Mainous Dep. 97-98). Mainous believed that to advance their research, College of Nursing Health faculty needed assistance with writing grants. He refused. Id. at 99-101. In another Graduate Research Assistant-hiring situation in 2015, after several candidates were interviewed – Plaintiff was one of the interviewers – not a single candidate offered the position would accept, each giving the reason that she did not want to work with Plaintiff. Id. at 104-08. Similarly, Mainous asked Plaintiff to support faculty and student attendance at the Midwest Nursing Research Society. Id. at 131-33. Wright State had previously sent two to four students with their mentors. Plaintiff flatly refused to support this activity, telling Mainous that he had no respect for regional research organizations. Id.

In addition, Plaintiff informed Mainous that he did not support the College of Nursing Health's Strategic Plan's goals and thought they were inappropriate. Id. at 134-35. Mainous directed Plaintiff to conduct an assessment and propose edits by spring 2016. She never heard back from him. Id. at 134-35, 143.

Plaintiff was to administer the College of Nursing Health's external mentor program. Mainous asked Plaintiff to find a research mentor for every College of Nursing Health faculty member who wanted one. Mainous admits that Plaintiff obtained two mentors, but seven or eight faculty members desired one. Plaintiff did not believe the program was of value, and refused to engage in it by 2016. Id. at 136-41.

Next, Wright State's letter explained that Mainous directed Plaintiff to develop research collaborations with local entities to further the interests of the College of Nursing Health and its faculty. Id. at 113. Mainous contacted Grandview Hospital towards the end of Plaintiff's time as Director and learned that although he had met with the Hospital, instead of establishing research connections to the benefit of College of Nursing Health, he pitched Grandview a proposal for his personal business, Cutcliffe Consulting.5 Id. at 114. According to the Hospital, Plaintiff never pursued any research. Id. at 119. Plaintiff admits engaging in this pursuit of self-beneficial activity. (Cutcliffe Dep. 437-40).

At Premier Health, Plaintiff got into a disagreement with the Director of Research and they wound up calling each other liars. Premier asked Mainous not to send Plaintiff to any further meetings. (Mainous Dep. 126-28). The arrangement was a "bomb." Id. at 188. At Wright Patterson Air Force Base, Mainous was unaware of any outcomes and she learned that Plaintiff had waited 15 months after his initial meeting to conduct any follow-up. Id. at 128-30.

While all parties agree that Plaintiff's record of publications was excellent, he failed to conduct any research himself at Wright State. Mainous expected Plaintiff to model behavior for junior faculty, and this included conducting research and writing grants. Id. at 153-54. She saw no evidence of this. Id.

Rather, Plaintiff was preparing to submit a major grant (SAMHSA) in April 2016. Plaintiff repeatedly reported to Mainous that he was making progress. Due to the size of the grant, steps needed to be taken months in advance of submission. This included coordination with Wright State's Office of Research. Mainous was concerned about the grant's progress, so she checked with the Office in March 2016 to learn that: Plaintiff had not interacted with the Office at all; and Wright State was not eligible for the grant in the first place. Id. at 154-57. Plaintiff did apply for other grant funding, but nothing was awarded. (Cutcliffe Dep. 384).

Wright State's letter also cited other events that contributed to the decision to remove Plaintiff as Director. (See generally, Mainous Dep. 157- 59, 163-177). These included Plaintiff being invited to assist with a proposal being spearheaded by a Wright State Engineering Professor. Id. at 168-73. Instead of assisting, Plaintiff took over the project and usurped the Professor's authority. The professor contacted Mainous and informed her that he wanted Plaintiff off the project (he told Mainous that he was trying "to find an elegant way to distance myself from the current project with [Plaintiff]"). (Id.; Ex. LL, p. 2). The Engineering Dean got involved. Id. at 172. When Plaintiff learned of the Professor's withdrawal from the project, he directed the professor to put his reasons in writing (which, the professor declined). (Mainous Dep. 169; Cutcliffe Dep. 319).

In another example, a College of Nursing Health professor took offense at Plaintiff directing the word "guys" at her on the basis of her status as an African-American female. This was in October 2015, and Mainous forwarded the email exchange between Plaintiff and the professor to Berberich with the admonition, "We are treading in dangerous territory here." (Mainous Dep. 333-34; Ex. Z).

In determining whether Wright State had an "honest belief" in the basis for the Director removal, the Court examines whether Mainous established a "reasonable reliance" on the particularized facts available to her. *Braithwaite*, 258 F.3d at 494. "The critical inquiry is whether Defendants made a 'reasonably informed and considered decision.'" Id., quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 806-07 (6th Cir. 1998). "[W]e do not require that the decisional process used by the employer be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." Id. Here, Plaintiff has failed to cite any evidence suggesting that Mainous did not hold an honest belief in her reasons for removing him as Director or that Mainous failed to make a "reasonably informed and considered decision." See *Abdulnour v. Campbell Soup Supply Co.*, 502 F.3d 496 (6th Cir. 2007) (affirming grant of summary judgment for employer where decision maker had before him complaints from various people about plaintiff's inadequate job performance and demeaning treatment of others, and where decision maker personally observed that plaintiff failed to address problems that were his responsibility). A decision is insulated by the honest belief rule even when the employer has numerous reasons for the plaintiff's removal, but only told the Plaintiff he was being terminated for a "personality conflict," and not

poor performance; and were "skeptical of undocumented accounts of employee conduct that may have been created post-termination." Id. at 503.

Because Plaintiff has no direct evidence that gender or national origin animus motivated employment action against him, was not replaced as Director, and cannot disprove the stated non-discriminatory reasons as pretext, summary judgment will be awarded to Wright State on Plaintiff's employment discrimination claims.

## B. Retaliation Claim

Title VII forbids employer actions that discriminate against an employee because the employee participated in protected activity, such as an EEO investigation. *Burlington N. & Santa Fe Ry. Co v. White*, 548 U.S. 53, 59 (2006). Where a plaintiff relies on indirect evidence to establish his claim, the familiar *McDonnell Douglas* burden-shifting framework applies. *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014). To establish a *prima facie* case of retaliation, a plaintiff must demonstrate that: "(1) he engaged in activity protected by Title VII; (2) his exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was materially adverse to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action." Id. To satisfy the third prong, the plaintiff "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. Ry.*, 548 U.S. at 67-68 (internal quotation omitted). The standard is objective and does not protect a plaintiff from trivial harms, such as petty slights, minor annoyances, and a simple lack of good manners, which are not likely to deter victims from complaining to the EEOC. Id. at 68.

"Opposing conduct" sufficient to support a Title VII retaliation claim includes complaining to anyone— management, other employees, unions or newspapers— about allegedly unlawful practices; refusing to obey an order because the worker thinks it is unlawful, and opposing unlawful acts by persons other than the employer, such as former employers and co-workers. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579 (6th Cir. 2000). Courts do not require that a plaintiff's complaints be lodged with absolute formality, clarity, or precision. *Stevens v. St. Elizabeth Med. Ctr., Inc*., 533 Fed. Appx. 624, 631 (6th Cir. 2013).

Cutcliffe raised concerns about discrimination, hostility, incivility and bullying directed at him with Wright State Administrators Berberich and Bill Rickert on November 10, 2015. "[T]o establish actionable retaliation, the relevant decision maker, not merely some agent of the defendant, must possess knowledge of the plaintiff's protected activity." Esc*her v. BWXT Y-12, LLC*, 627 F.3d 1020, 1026 (6th Cir. 2010). Mainous had no knowledge of any protected activity. (Mainous Dec., ¶8) Therefore, there is no causal connection. Thus, Plaintiff's Title VII retaliation claims fail as well.

Because Plaintiff can show no causal connection between his complaints to Wright State administrators and the decision of Mainous to terminate his Director position and because other incidents of which he complains do not amount to actionable facts, the Court will award summary judgment to Wright State on Plaintiff's retaliation claim.

## C.  Constructive Discharge

To demonstrate a constructive discharge, Plaintiff must adduce evidence to show that 1) "the employer ... deliberately create[d] intolerable working conditions, as perceived by a reasonable person," and 2) the employer did so "with the intention of forcing the employee to

quit...." *Logan v. Denny's, Inc.*, 259 F.3d 558, 568–69 (6th Cir. 2001) (quoting *Moore v. KUKA Welding Sys.*, 171 F.3d 1073, 1080 (6th Cir. 1999)." "To determine if there is a constructive discharge, both the employer's intent and the employee's objective feelings must be examined." Id. (citing *Held v. Gulf Oil Co.*, 684 F.2d 427, 432 (6th Cir. 1982)).

Whether a reasonable person would feel compelled to resign depends on the facts of each case, but the following factors are relevant: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status. *Logan v. Denny's, Inc.*, 259 F.3d 558, 569 (6th Cir. 2001) (citing *Brown v. Bunge Corp.*, 207 F.3d 776, 782 (5th Cir. 2000); and *Barrow v. New Orleans Steamship Ass'n*, 10 F.3d 292, 297 (5th Cir. 1994)).

As regards Plaintiff's cessation of work, Plaintiff must first exhaust the administrative remedies available to him for each Title VII claim prior to filing suit in federal court. *Haithcock v. Frank*, 958 F.2d 671, 675 (6th Cir. 1992). Pursuant to 42 U.S.C. § 2000e-5(e)(1), an EEOC charge must be filed within 300 days after the unlawful act occurred. Here, Plaintiff was informed that he was removed as Director on March 23, 2016, and he filed his EEOC charge on July 8, 2016. (Ex. TT). Plaintiff never filed another EEOC charge. His right to sue letter was issued on April 4, 2017. (Ex. UU). Plaintiff resigned after his letter was issued, on May 15, 2017. (Cutcliffe Dep. 402; Ex. VV).

Plaintiff did not file a charge after his alleged constructive discharge occurred on May 15, 2017. The "scope of investigation" doctrine requires a constructive discharge claims to arise from

the EEOC investigation. See *Flowers v. Potter*, 2008 U.S. Dist. LEXIS 23980, *31-33 (S.D. Ohio Mar. 11, 2008) and *Schaefer v. United States Postal Serv*., 254 F. Supp. 2d 741, 750-51 (S.D. Ohio Dec. 9, 2002).

Moreover, Title VII is not a general civility code. see *Oncale v. Sundowner Offshore Servs*., 523 U.S. 75 (1998). The conduct alleged does not rise to "intolerable working conditions."

Because Plaintiff did not administratively exhaust his constructive discharge claim, and because the conduct alleged does not rise to "intolerable working conditions," the Court will award summary judgment to Wright State on Plaintiff's retaliation claim.

## D.    Wright State's Counterclaim

"A plaintiff must establish the following three elements to prove unjust enrichment: (1) a benefit conferred by the plaintiff upon the defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment." *Maghie & Savage, Inc. v. P.J. Dick, Inc*., 10th Dist. No. 08AP-487, 2009-Ohio-2164, ¶33.

After he was removed as Director, Plaintiff's salary was never decreased; he was to receive his Director salary through July 31, 2017, but resigned in May 2017. (Cutcliffe Dep. 374; Ex. PP). Mainous and Plaintiff never talked to one another after he was removed as Director. (Mainous Dep. 53; Cutcliffe Dep. 394).9

Plaintiff claims he worked throughout summer 2016. (Cutcliffe Dep. 391). On August 25, 2016, Plaintiff emailed the Provost claiming that when his office was moved down the hall over the summer, his assigned computer has been "stolen and replaced – by [Wright State] – with an

inferior computer." (Ex. EEE). Plaintiff admits that these allegations turned out to be false. (Cutcliffe Dep. 452). It is unclear what work Plaintiff could have done that summer.

Plaintiff began teaching two courses during the fall semester 2016, which started in late August. (Cutcliffe Dep. 93). He took a leave of absence as of September 19, 2016, and never returned.

Plaintiff submitted FMLA paperwork on September 28, 2016, requesting retroactive FMLA leave beginning September 19. (Ex. HHH). Berberich requested a second opinion, as authorized under the collective bargaining agreement, because "it was difficult to ascertain from the documentation whether he could accomplish his work as a faculty member." (Berberich Dep. 76; Ex. JJJ). Plaintiff refused to attend this medical appointment (Cutcliffe Dep. 465), yet Wright State approved his FMLA request for the full 12 weeks from September 19 - December 11, 2016. (Cutcliffe Dep. 470; Ex. QQQ). Plaintiff exhausted his accrued vacation time on October 18, and Wright State no longer paid him as of this date. (Ex. MMM).

The remainder of Plaintiff's time as a Wright State employee consisted largely of Wright State sending him various communications inquiring about his return to work status and encouraging him to pursue other forms of leave(s) if unable to return, and Plaintiff not responding. (Dep. Exs. NNN, OOO, PPP, RRR). Plaintiff's medical care provider never supplied him with a return-to-work date and he never felt capable of returning to work. (Cutcliffe Dep. 468). Plaintiff acknowledges that Wright State considered him to be, and notified him that he was absent without leave effective the first day after his FMLA leave expired, December 12, 2016. (Id. at 480; Ex. PPP). Plaintiff never attempted to substantiate his leave post-December 12 – indeed he never

even requested leave beyond December 30, 2016 – and tendered his voluntary resignation on May 15, 2017. (Cutcliffe Dep. 402-03; Ex. VV).

Wright State conferred a benefit on Plaintiff by compensating him for a time period when Plaintiff otherwise should not have been paid (because he was on leave not doing any work and had exhausted all of his paid vacation time). Second, Plaintiff was aware of the benefit as he received the compensation in his bank account. He also received notice through the efforts Wright State took to try to recoup the money.

Berberich sent Plaintiff an email on November 21, 2016, explaining that his paid leave had expired on October 18, 2016. (Ex. MMM). On December 7, 2016, Henne sent Plaintiff an email and notified him that Wright State would be contacting him separately to address the repayment of the six weeks of unearned compensation. (Ex. NNN). The next day, Henne sent Plaintiff a letter detailing the overpayment amounts and requesting payment by December 15, 2016. (Ex. OOO). On March 13, 2017, Henne sent Plaintiff a letter explaining that Wright State had provided insurance premiums to him through January 31, 2017, and requesting payment. (Ex. SSS). She also warned Plaintiff that payment for his premiums for the month of February 2017 were considered to be past due if payment was not received by March 31, 2017. Id. Henne informed him that in order for Plaintiff to bring himself current in all coverages through February 2017, he was required to remit $5,385.00 by March 27, 2017. Id. On March 29, 2017, Henne sent Plaintiff a letter notifying him that since he had not provided any insurance premium payments, that his various benefits were cancelled retroactively effective January 31, 2017. (Ex. TTT). On May 23, 2017, Wright State's Payroll Manager sent Plaintiff a letter demanding repayment of $17,460.24. (Ex. VVV).

Third, Plaintiff retained the benefit of these overpayments. Cutcliffe claims that the denial of his paid sick leave request was "fraudulent." (Cutcliffe Dep. 475). Plaintiff's assertion is insufficient to overcome summary judgment. Wright State overpaid wages and benefits to Plaintiff and has provided calculations to Plaintiff setting forth these amounts. (See Exs. OOO, VVV; and SSS, TTT).

An unjust enrichment claim is the proper mechanism to recover an overpayment of wages by an employer to an employee. See, e.g., *Cent. Ohio Sheet Metal, Inc. v. Walker*, 10th Dist. No. 03AP-951, 2004-Ohio-2816. Wright State is entitled to summary judgment on its claim of unjust enrichment against Plaintiff in the amount of $22,845.24.

Plaintiff argues that Wright State breached a duty of "good faith and fair dealing" by requiring Plaintiff to attend a "second opinion" medical exam. (See Memo Contra, p.10 et seq.). However, none of the cases cited by Plaintiff in his opposition (See Memo Contra, pp.10-13) recognize "good faith and fair dealing" as a defense to an unjust enrichment claim. Moreover, the Ohio Supreme Court "ha[s] rejected the contention that a party breaches the implied duty of good faith and fair dealing merely by seeking to enforce the contract or by acting as permitted by its express term." *Lucarell v. Nationwide Mut. Ins. Co*., 152 Ohio St.3d 453, 2018-Ohio-15, 97 N.E.3d 458, ¶ 43. Therefore, Defendant Wright State University will prevail on its Motion for Summary Judgment on Its Counterclaim. ECF 32.

## IV.    Conclusion

Because Plaintiff has no direct evidence that gender or national origin animus motivated employment action against him, was not replaced as Director, and cannot disprove the stated non-discriminatory reasons as pretext, and because Plaintiff can show no causal connection between

his complaints to Wright State administrators and the decision of Mainous to terminate his Director position and because other incidents of which he complains do not amount to actionable facts, and because Plaintiff did not administratively exhaust his constructive discharge claim, and because the conduct alleged does not rise to "intolerable working conditions," Defendant's Motion for Summary Judgment, ECF 31, is **GRANTED**.

Because Wright conferred a benefit on Cutcliffe and because Cutcliffe had knowledge of the benefit, and because retention of the benefit by Cutcliffe would be unjust the Court **GRANTS** Defendant Wright State University's Motion for Summary Judgment on Its Counterclaim, ECF 32, is **GRANTED**.

Defendant's Motion to Strike ECF 38 Response in Opposition to Motion, ECF 42, is **DENIED**. Wright State University is **ORDERED** to submit a proposed judgment entry by February 1, 2019.

**DONE** and **ORDERED** in Dayton, Ohio, this Thursday, January 24, 2019.

s/Thomas M. Rose

_____
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE